956 F.2d 619
 COMMUNITIES, INC.; Dulworth & Rives, Inc.; Prestonia Area
Neighborhood Association; Highland Park
Neighborhood Association; Standiford
Neighborhood Association, Petitioners,
v.
James B. BUSEY, Administrator, Federal Aviation
Administration; Federal Aviation Administration,
Respondents,
Regional Airport Authority of Louisville and Jefferson
County, Kentucky, Intervening Respondent.
COMMUNITIES, INC., Petitioner,
v.
Samuel K. SKINNER, Secretary of the United States Department
of Transportation; United States Department of
Transportation, Respondents,
Regional Airport Authority of Louisville and Jefferson
County, Kentucky, Intervening Respondent.
 Nos. 91-3222, 91-5386.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 30, 1991.
Decided Feb. 13, 1992.
Rehearing and Rehearing En Banc
Denied April 3, 1992.
 
 Robert E. Reeves (briefed), Todd E. Leatherman (briefed), W. Henry Graddy, IV (argued and briefed), Reeves & Graddy, Versailles, Ky., for Communities, Inc. and Dulworth & Rives, Inc.
 Joseph M. Whittle, U.S. Atty., David L. Huber, Asst. U.S. Atty., Louisville, Ky., Peter R. Steenland (briefed), M. Alice Thurston (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for Samuel K. Skinner and U.S.
 Michael M. Conway (briefed), Michael Schneiderman (argued), Hopkins & Sutter, Chicago, Ill., Robert W. Griffith, Stites & Harbison, Louisville, Ky., for Regional Airport Authority of Louisville and Jefferson County.
 Eleanore M. Garber, William H. Allison, Jr., Allison, Soreff & Garber, Joe G. Leibson, Louisville, Ky., for Prestonia Area Neighborhood Ass'n, Highland Park Neighborhood Ass'n and Standiford Neighborhood Ass'n.
 Peter R. Steenland (briefed), Dept. of Justice, Land and Natural Resources Div., J.E. Murdock, III, Robert F. Eisengrein, F.A.A., Office of Gen. Counsel, M. Alice Thurston (briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for James B. Busey and F.A.A.
 Elizabeth S. Merritt (argued and briefed), Andrea C. Ferster (briefed), Washington, D.C., for National Trust for Historic Preservation in the U.S., amicus curiae.
 Frank Shafroth (briefed), Washington, D.C., for the National League of Cities, amicus curiae.
 Donald L. Cox (briefed), Lynch, Cox, Gilman & Mahan, Louisville, Ky., for City of Louisville, Ky. and Jefferson County, Ky., amicus curiae.
 J. Thomas Cochran (briefed), Washington, D.C., for the U.S. Conference of Mayors, amicus curiae.
 Ronn E. Harding (briefed), Deputy Asst. Chief Counsel, FAA, Atlanta, Ga., for FAA.
 Before JONES and NELSON, Circuit Judges, and ROSEN, District Judge.*
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Petitioners, Communities, Inc. and others, seek review of a Federal Aviation Administration ("FAA") order approving the Louisville Airport Improvement Plan ("LAIP"). For the reasons that follow, we deny the petition and affirm the FAA's decision.
 
 
 2
 * A
 
 
 3
 Standiford Field ("SDF") is centrally located within the city limits of Louisville, Kentucky, in a developed environment, with residential neighborhoods to the north, industrial areas to the south, and various residential and commercial centers or strips to the east and west. Some of the residential neighborhoods, directly under the flight paths of the existing runways, are "historic neighborhoods." To the northeast and west of SDF are a number of such neighborhoods, including Cherokee Triangle, Southern Heights-Beechmont, and Highlands. Another historic neighborhood to the north is Old Louisville, an inner-city neighborhood, bordered by the following: Interstate 65 to the east; railroads, rail yards, and industrial areas to the west and northwest; downtown, commercial Louisville to the north; and the University of Louisville (Belknap Campus) to the south.
 
 
 4
 SDF has operated since 1947. In addition to serving nine commercial airlines, SDF has been the national hub for United Parcel Service ("UPS") since 1981. UPS's operations have caused a dramatic growth in both express and air cargo aircraft operations; in four years, express cargo volumes have increased almost fivefold. The Final Environmental Impact Statement ("FEIS") states that, since 1982, there has also been steady growth in the annual number of enplaned passengers and actual departures at SDF, with continued growth forecast. Petitioners maintain, however, that there is in fact no reliable evidence of any increase in passenger traffic, and that the forecasted future growth is based upon unrealistic estimates. Respondents counter that the forecast for passenger-traffic growth reflects national growth patterns and recognizes the steady continuing growth of cargo services. At oral argument, however, respondent Regional Airport Authority ("RAA") of Louisville and Jefferson County, Kentucky conceded that, "This is a cargo project."
 
 
 5
 The LAIP proposed adopting the recommendation of a study conducted by the RAA through its contractor, Schimpeler-Corradino Associates, which calls for two independent, parallel runways to be constructed on the current site of SDF. To accommodate the new runways, the airport boundaries must be expanded. This involves the acquisition or relocation of a number of commercial and industrial sites and other businesses. Three residential neighborhoods adjacent to the airfield's boundaries (Prestonia, Standiford, and Highland Park) are being cleared and developed for uses compatible with the airport. Only a portion of the acreage acquired in the land acquisition program will be used for the airport itself. As of the date of the FAA's order, 69% of all residential structures had been purchased. In addition, the project contemplates the temporary closure and permanent realignment of a portion of Crittenden Drive.
 
 
 6
 As a result of the new runways, SDF will be able to accommodate UPS's nighttime operational needs. The project will also increase the airport's maximum capacity by 67%.
 
 
 7
 On June 22, 1988, the RAA approved the plan to construct the two independent runways and called for the immediate commencement of an environmental assessment to meet the requirements of federal law, including Department of Transportation Act, § 4(f), 49 U.S.C. § 303 (1988). Based on this information and national and regional needs, the respondent Secretary of the Department of Transportation ("DOT"), acting through the FAA, formally approved federal funding for the LAIP in the January 7, 1991 Record of Decision ("ROD"). The decision stated that the LAIP complied with, inter alia, § 4(f).
 
 
 8
 Petitioners consist of the following organizations with interests in the communities located near the airport: Communities, Inc., which is an umbrella organization representing Beechmont Neighborhood Association, Inc., Cloverleaf Neighborhood Association, Inc., Okolona Community Council, Old Louisville Neighborhood Association, St. Joseph Neighborhood Association, and the municipalities of Minor Lane Heights and South Park View; Dulworth & Rives, Inc., which is a real estate development firm in Louisville, Kentucky that owns several investment properties to the south of SDF; and Prestonia Area Neighborhood Association, Highland Park Neighborhood Association, and Standiford Neighborhood Association, which are independent neighborhood associations representing residents in the three neighborhoods slated for demolition due, in part, to the LAIP.[1] On March 7, 1991, petitioners filed a timely petition for review by this Court of the FAA's order of January 7, 1991, granting federal approval for the LAIP. On March 25, 1991, pursuant to 28 U.S.C. § 1631 (1988), the United States District Court for the Western District of Kentucky transferred to this Court a complaint also challenging the January 7, 1991 order, filed by petitioners on March 6, 1991. Pursuant to 49 U.S.C.App. § 1486(a) (1988), this Court has exclusive jurisdiction over both the claims presented in that complaint and the claims in the petition for review.
 
 
 9
 Petitioners assert that the Environmental Impact Statement ("EIS") prepared by the FAA for this project violates the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. §§ 4321-4347 (West 1977 & Supp.1991); that the FAA also violated National Historic Preservation Act ("NHPA"), § 106, 16 U.S.C. § 470f (1988), by failing to consult adequately with the Advisory Council on Historic Preservation; and that the FAA violated both § 4(f) and a similar provision in the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C.App. § 2208(b)(5) (1988), because this project will result in the constructive "use" of properties protected by that statute and more could be done to minimize adverse impacts. They contend that the FEIS analysis omitted a number of cumulative impacts associated with the project, including the impact of the LAIP on numerous hazardous waste sites and the resulting remediation of hazardous wastes on those sites, and the impact from the deferred relocation of a major thoroughfare (Crittenden Drive). Additionally, petitioners contend that the FEIS fails to evaluate all reasonable alternatives and their environmental consequences, particularly the noise impacts of those alternatives and the impact on historic and park resources protected by § 4(f).
 
 
 10
 The FAA states through the FEIS, however, that implementation of the LAIP will substantially reduce overall noise exposure in the Louisville community. The FAA plans to accomplish this by, inter alia, directing traffic, whenever possible, over the industrial areas south of the airport between 10:00 p.m. and 7:00 a.m. ("contraflow" operations). Furthermore, UPS has agreed to operate only quieter, "Stage III" aircraft in Louisville by 1995, if the LAIP is fully implemented. Nonetheless, the FAA concedes that noise exposure will shift, causing noise levels to increase in certain areas, such as Old Louisville.
 
 B
 
 11
 In addition to the petition for review filed in this Court and the complaint filed in district court that was transferred to this Court, petitioners also instituted various other, indirect challenges to the airport expansion plan. Those proceedings evolved from a decision of the City of Louisville on June 22, 1988 to begin using the city's urban renewal powers to acquire the neighborhoods of Prestonia, Standiford, and Highland Park in order to create a commercial zone around the airport. This decision was announced simultaneously with the LAIP and was collectively called "The Airport Expansion Project."
 
 
 12
 To implement the urban renewal program, the city passed ordinances declaring each of the three neighborhoods to be "blighted" and subject to the city's condemnation powers. On October 18, 1990, the Kentucky Supreme Court held that the city's finding of blight was not supported by substantial evidence and was "such an abuse of discretion as to be arbitrary" in violation of Section 2 of the Kentucky Constitution. Prestonia Area Neighborhood Ass'n v. Abramson, 797 S.W.2d 708, 712 (Ky.1990).
 
 
 13
 The city continued with the project, taking the position that the acquisition of the three neighborhoods is still valid as a land-use program pursuant to the Kentucky statutes that authorize airport authorities to condemn land for airport activities. The neighborhoods then brought actions, which were pending at the time of this appeal, in the United States District Court for the Western District of Kentucky to obtain injunctive relief against the RAA to preclude the RAA's further acquisition of properties under threat of condemnation by the City of Louisville. They argued that the court should also declare the prior acquisitions void and prohibit demolition of vacated houses. Their suit was based upon the principle of Kentucky law that forbids condemnation of land owned by one private individual for transfer to another private entity, including airport-supported commercial enterprises. At oral argument, counsel for petitioners represented that the neighborhoods of Prestonia, Standiford, and Highland Park and the RAA had reached a settlement, resulting in the withdrawal of the three neighborhoods as parties to this petition.
 
 II
 
 14
 Petitioners' main contention is that the FAA's decision failed to assess whether the protected § 4(f) resources located outside the projected 65 Day-Night Level (Ldn) noise contour would be "used" by the LAIP. Ldn is calculated by adding up all the sound exposure during daytime (7:00 a.m.-10:00 p.m.) plus 10 times the sound exposure occurring during the nighttime and averaging this total sum by the number of seconds during a 24-hour day. Points of equal exposure are then connected by contour lines.
 
 
 15
 Petitioners explain that, as a result of a dispute with the Environmental Protection Agency ("EPA") regarding the noise analysis conducted at the Toledo airport, the FAA agreed to engage in a comprehensive reevaluation of the appropriateness of using 65 Ldn as the sole indicator of adverse environmental effects from noise. While this reevaluation is in process, the FAA agreed to include a supplemental single event noise ("SEL," derived from peak Sound Exposure Level) analysis in subsequent projects. After being reminded of its commitment, the FAA performed such an analysis in this case. Petitioners contend that the analysis was inadequate, but that it still revealed significant noise problems for areas outside the 65 Ldn contour.
 
 
 16
 The FAA contends that, because there is no reliable correlation between SEL data and human response, the FAA properly declined to measure its statutory obligations under NEPA, NHPA, or § 4(f) by reference to SEL information. The 65 Ldn standard was established in response to Congress's direction that the FAA produce a reliable methodology for measuring noise and human response. See, e.g., Aviation Safety and Noise Abatement Act of 1979, 49 U.S.C.App. § 2102 (1988).
 
 
 17
 In general, agency decisions are set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). In particular, judicial review of NEPA compliance is limited in scope. "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).
 
 
 18
 Agency decisions under the Transportation Act are reviewed under the same arbitrary and capricious standard. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In cases involving § 4(f), however, the court must additionally find "that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." Id.
 
 
 19
 There is no judicial support for petitioner's argument that the FAA was required to go beyond the Ldn cumulative noise impact methodology or use some standard other than 65 Ldn for its determinations under any of the statutes. In Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 128 (D.C.Cir.1985), the District of Columbia Circuit rejected a challenge to FAA's use of the Ldn noise methodology:
 
 
 20
 Petitioner contends that the use of cumulative noise level analysis rather than individual event noise level analysis is unacceptable. The FAA adopted cumulative noise level analysis to satisfy the Aviation Safety and Noise Abatement Act of 1979, 49 U.S.C. § 2102 (1982), which calls for establishment of a uniform test for all airport compatibility plans. It is clearly within the expertise and discretion of the agency to determine proper testing methods. We find no abuse of discretion in the choice of the cumulative noise level analysis methodology....
 
 
 21
 ... The fact that the agency in exercising its expertise relied on the cumulative impact levels as being more indicative of the actual environmental disturbance is well within the area of discretion given to the agency.
 
 
 22
 (Citations omitted); see also Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 201 (D.C.Cir.1991) (the agency's choice of scientific method to measure noise was "obviously not capricious"), cert. denied, --- U.S. ----, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991); Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, 469 (1st Cir.1989) (holding that choice of cumulative noise data over single event noise data--while not "immune from criticism or legal attack"--was not unreasonable under the circumstances); C.A.R.E. Now, Inc. v. FAA, 844 F.2d 1569, 1573 (11th Cir.1988) (FAA has discretion to determine proper testing methods); Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 197 (7th Cir.) (same), cert. denied, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986).
 
 
 23
 Furthermore, we agree with the District of Columbia Circuit that "[t]he EPA's criticisms of the FAA, and the agencies' subsequent deal, do not change our view of the FAA's findings." Citizens Against Burlington, 938 F.2d at 201. This is particularly true in the instant case, because the FAA collected and analyzed SEL data. See J.A. at 3653. Petitioners apparently want this court not only to tell the FAA that SEL is superior to Ldn, but also to tell the FAA how the SEL data should affect its analysis. If this court were to grant petitioners' request, it would be traveling far outside both its constitutional role and its expertise. On the record presented, there is no basis for holding that the FAA's noise analysis was an abuse of discretion.
 
 
 24
 Our approval of the FAA's noise methodology necessarily entails finding that the LAIP did not use § 4(f) resources outside the 65 Ldn contour. Even if this court were to consider the SEL data, however, petitioners have failed to demonstrate how mere noise may "use" the primary § 4(f) resources involved in this case. The property in Old Louisville qualified for listing on the National Register because of its architectural importance and historical significance. It was not arbitrary or capricious for the FAA to determine that an increase in noise levels would not affect the relevant characteristics of Old Louisville--its architecture and its place in history--particularly given that Old Louisville falls outside the 65 Ldn contour used as a standard measure of adverse noise impacts on residential property. Although courts have recognized that noise alone may "use" a park, see, e.g., Citizens Against Burlington, 938 F.2d at 202-03, and that noise combined with air pollution and elimination of view, resulting from the close location of a proposed highway, may use historic property, Coalition Against a Raised Expressway, Inc. v. Dole, 835 F.2d 803, 812 (11th Cir.1988), the rationale of those cases does not provide support for petitioners here.
 
 
 25
 Furthermore, petitioners have failed to propose an alternative that would not use § 4(f) resources. Other circuits have held that an alternative route that causes substantially equal damage to § 4(f) property is not a cognizable alternative within the meaning of § 4(f). Coalition on Sensible Transp. ("COST"), Inc. v. Dole, 826 F.2d 60, 65 (D.C.Cir.1987); Druid Hill Civic Ass'n v. Federal Highway Admin., 772 F.2d 700, 715 (11th Cir.1985). In COST, the appellant argued that there was no support in the record for the Secretary's determination that it was prudent to impact one historic site as opposed to another. The court rejected this argument, however, stating that "formal findings are not required in a § 4(f) determination." 826 F.2d at 66. We agree with the District of Columbia Circuit that the burden of suggesting a cognizable alternative is properly placed on petitioners.
 
 
 26
 At oral argument, petitioners suggested "alternative 4," which involves expansion of SDF over an uninhabited landfill to the south. In the FEIS, the FAA summarized alternative 4 as follows:
 
 
 27
 This alternative calls for installation of an east-west parallel runway south of Standiford Field and parallel to the existing east-west runway (11/29). The distance between the two runways would exceed 4,300 feet, allowing fully independent, simultaneous operations during both good and bad weather based on FAA rules. However, it would require closing the landfill in the area of Outer Loop and I-65 operated by Waste Management of Kentucky, Inc. Major portions of the landfill would have to be stabilized and/or removed. Several businesses would be displaced to accommodate the western end of the runway and taxiway connection to the existing airport. The runway and taxiway facility would be built to accommodate the function of Slop Ditch, a major drainage channel splitting the existing landfill site. It is possible that the interchange of Outer Loop with I-65 would constitute an obstruction within the required clear zone, requiring elevation of the east end of the runway on fill material.
 
 
 28
 J.A. at 3615. In light of the foregoing evidence, the FAA concluded that alternative 4 was "extremely inefficient" and, of particular importance here, would "[r]esult in almost all flights passing over noise-sensitive areas immediately east and west of the airfield." J.A. at 3618. Thus, petitioners fall far short of suggesting a feasible alternative that would not also use § 4(f) resources. Lacking a feasible alternative under § 4(f)(1), the FAA is entitled to proceed, as long as it undertakes measures to mitigate the impact on § 4(f) resources under § 4(f)(2). See 49 U.S.C. § 303(c)(1), (2) (1988).
 
 
 29
 Finally, our approval of the FAA's noise methodology also means that the FAA is required neither to reopen public comment following publication of SEL data nor prepare a supplemental EIS analyzing the impact of increased single event noise. Even if we were to consider the SEL data, however, the agency's determination of whether new information requires the preparation of a supplemental EIS is also subject to review under the arbitrary and capricious standard. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375-76, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). Given that the FAA did in fact discuss the SEL data and determined that the information did not alter its conclusions regarding the noise impacts of the LAIP, we do not find that the agency in any way abused its discretion.
 
 III
 
 30
 Petitioners contend also that the FAA violated the NEPA by "segmenting" the analysis of hazardous wastes and transportation. Petitioners' criticism of the FAA's analysis of the hazardous substances impacts of the LAIP hinges on the perceived lack of a complete remediation or mitigation plan. In so arguing, petitioners run afoul of the Supreme Court's directive in Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).
 
 
 31
 In Robertson, the Supreme Court unanimously reversed the Ninth Circuit's holding that NEPA required a complete mitigation plan to be developed and included in an environmental impact statement. The Court stated that
 
 
 32
 it would be inconsistent with NEPA's reliance on procedural mechanisms--as opposed to substantive, result-based standards--to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.
 
 
 33
 We thus conclude that the Court of Appeals erred, first, in assuming that "NEPA requires that 'action be taken to mitigate the adverse effects of major federal actions,' " and, second, in finding that this substantive requirement entails the further duty to include in every EIS "a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action."
 
 
 34
 Id. 109 S.Ct. at 1847 (citations omitted).
 
 
 35
 The FAA's discussion in the FEIS of remediation is precisely the type of analysis explicitly approved of in Robertson--identification and discussion of various potential measures to mitigate the environmental impact of the LAIP. As the ROD concludes, "sufficient investigation has been accomplished to identify the type of contaminants, a reasonable estimate of the extent of contamination, alternatives for remedial actions, and a reasonable estimate of the cost to remediate." J.A. at 3878. FAA's investigation regarding the hazardous substances impacts of the LAIP meets the "hard look" standard. See Mason County Medical Ass'n v. Knebel, 563 F.2d 256, 264-65 (6th Cir.1977) (NEPA hard look requirement is tempered by a practical rule of reason; impact statement need not document every particle of knowledge an agency might compile in assessing a project); National Resources Defense Council, Inc. v. Tennessee Valley Auth., 502 F.2d 852, 853-54 (6th Cir.1974) (same).
 
 
 36
 As for the "transportation impact"--that is, the closing of Crittenden Drive--the FEIS and ROD make it clear that the drive will be closed. Reconstruction, if it takes place at all, will not take place for at least ten years, and plans for reconstruction have not yet been determined. Under the principles in Robertson, the FAA may properly delay consideration of the environmental impacts of this speculative project and, instead, treat the drive as closed. See J.A. at 1925-38 (discussing the impact of closing Crittenden Drive).
 
 IV
 
 37
 Petitioners contend also that the FAA violated the NEPA by failing to consider and analyze the impact of the proposed acquisition and destruction of the Standiford, Prestonia, and Highland Park neighborhoods as part of the proposed action alternative. They allege that the draft FEIS described the demolition of 1,300 units in the three neighborhoods adjacent to the airport as urban renewal action that would occur without regard to the airport expansion and, therefore, evaluated the destruction of these residential areas as part of the no-action alternative. Upon the decision of the Kentucky Supreme Court that such acquisition was undertaken in an unconstitutional manner, petitioners contend that the FAA was required to reopen the public hearing process and receive comment on the impact this decision has on the analysis of the consequences of the airport expansion.
 
 
 38
 With or without the expansion of SDF, the governments of Louisville and Jefferson County have been and remain committed to removing certain residential properties from the three neighborhoods near SDF that are currently heavily impacted by aircraft noise. They have demonstrated that commitment by moving ahead with a land acquisition program--using strictly local money--long before there was any assurance that the airport project would, or could, be built. That program was already 69% complete in January 1991. It is fully discussed in the FEIS, just as the Prestonia decision is fully discussed in the ROD.
 
 
 39
 Petitioners essentially advance another "segmentation" argument, contending that the FAA characterized the land acquisition as a separate project in order to avoid performing the requisite environmental analysis. Petitioners cannot succeed with a segmentation argument, however, because (1) the FAA performed the environmental analysis, and (2) even in the absence of any environmental analysis, the local land-acquisition program has independent utility within the meaning of Historic Preservation Guild v. Burnley, 896 F.2d 985, 990-92 (6th Cir.1989).[2]
 
 V
 
 40
 Petitioners contend also that the FAA violated the NEPA by failing to consider the alternatives. For an agency to conclude that there is no "feasible" alternative, "the Secretary must find as a matter of sound engineering it would not be feasible to build the [project] along any other route." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). Feasible alternatives may nonetheless be rejected if they present "unique problems" or cause extraordinary costs and community disruption. Id. at 413, 91 S.Ct. at 822.
 
 
 41
 The two alternatives ultimately considered in the FEIS--the LAIP and the no action alternative--were arrived at from about two dozen initially considered. Working Paper No. 1, "Airport Improvement Alternatives," presented discussions of alternative facility improvements that had a reasonable expectation of implementation, grouped in five categories of operation. Five potential airport configurations were then selected for detailed evaluation and their costs and effects were presented in Schimpeler-Corradino Technical Report No. 2, "Evaluation of Alternatives," and No. 3, "Selection of Preferred Alternative." These five are depicted in the FEIS. They include the two configurations that petitioners urge would be more appropriate--that is, the only two variations that would avoid taking the historic properties of James Lowell Elementary School, Grove Park and Highland Park Community Center, and the residence at 2111 South Park Road. A thorough discussion of the alternatives is presented in the FEIS, and for each, the FEIS includes a graphic configuration, an engineering analysis, and an explanation of why the alternative was either imprudent or infeasible. In addition to the FEIS discussion of these alternatives, the administrative record is replete with extensive documentation of a very detailed evaluation. The FAA selected the fifth alternative as the only practical and feasible alternative.
 
 
 42
 The reasons for deeming the other alternatives infeasible were fully explained. The FAA reasonably rejected several of the alternatives that presented severe engineering requirements. Other alternatives were found to be imprudent for reasons including their high cost, safety hazards, operational difficulties, and disruptions to landfills and noise-sensitive areas. In short, each was rejected because it presented unique problems and would not accomplish the goal of increasing capacity at SDF. By focusing on the ROD and FEIS, which represent only the final stage in the lengthy review process, petitioners ignore the enormous record evidence on feasibility.
 
 VI
 
 43
 For the foregoing reasons, the Secretary of Transportation's approval, through the Federal Aviation Administration, of the Louisville Airport Improvement Plan is AFFIRMED, and accordingly, the petition for review is DENIED.
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The neighborhood associations of Prestonia, Highland Park, and Standiford withdrew from this appeal as a result of the settlement described in Part I.B of this opinion
 
 
 [2]
 Because of our disposition of this issue, we offer no opinion as to what effect, if any, the withdrawal of the Prestonia, Highland Park, and Standiford neighborhood associations as parties to the instant petition has upon the standing of the remaining neighborhoods to contest this issue