**SAVE OUR CUMBERLAND MOUNTAINS, et al.,**
Plaintiffs,

v.

**Gale A. NORTON, et al., Defendants.**

No. 3:03–CV–462.

United States District Court,
E.D. Tennessee,
at Knoxville.

Oct. 31, 2003.

Dean H. Rivkin, Knoxville, TN, Joe W. McCaleb, Hendersonville, TN, Mary Mastin, Cookeville, TN, Scott Gollwitzer, Asheville, NC, Amanda Moore, Prestonsburg KY, Martin J. Bergoffen, Asheville, NC, for plaintiffs.

Pamela G. Steele, U.S. Department of Justice, Office of U.S. Attorney, Charles P. Gault, U.S. Department of the Interior, Office of Field Solicitor, Knoxville, TN, for defendants.

John W. Hays, Laura Keller, Stites & Harbison, Lexington, KY, Garry K. Grooms, Stites & Harbison, PLLC, Nashville, TN, for intervenor defendant.

## MEMORANDUM OPINION

VARLAN, District Judge.

Plaintiffs in this action are four non-profit organizations who are seeking relief under the National Environmental Policy Act (hereinafter "NEPA") from the decision of the United States Department of the Interior Office of Surface Mining, Reclamation and Enforcement (hereinafter "OSM") to issue a permit to Robert Clear Coal Corporation (hereinafter "RCCC") to conduct mining operations in Campbell and Scott Counties, Tennessee. Plaintiffs assert that OSM's decision to issue the permit was arbitrary and capricious and not in accordance with the requirements of NEPA. The defendants in this action are

Gale A. Norton as the Secretary of the Department of the Interior, Jeffrey D. Jarrett as the Director of OSM, and George Miller as the Director of OSM's Knoxville Field Office. RCCC is an intervening defendant per this Court's previous order [Doc. 19].

The case is before the Court on the plaintiffs' motion for preliminary injunction [Doc. 2]. Plaintiffs are specifically requesting the court to issue an order "revoking Permit Number 3116 and enjoining Defendants, their agents and assigns from utilizing or allowing this permit to be utilized by the permit applicant/permittee, the Robert Clear Coal Corporation, until such time as Defendants have fully complied with the National Environmental Policy Act and the full environmental impacts of this massive coal mining operation have been studied." [Id.] Plaintiffs' motion is vigorously opposed by OSM and RCCC. The Court has carefully reviewed the parties' briefs, affidavits, and supporting documents [Docs. 3, 15, 20, 21, 22, 25], as well as considered the arguments of counsel presented on October 7, 2003.

For the reasons set forth herein, the Court will respectfully **DENY** plaintiffs' motion for preliminary injunction.

## I. *Relevant Facts*

Plaintiffs initiated this action on September 4, 2003, to challenge OSM's decision to issue permit number 3116 to RCCC to conduct coal mining operations in Campbell and Scott Counties, Tennessee. [Doc. 1 at ¶ 1.] RCCC's application was submitted to OSM pursuant to the Surface Mining Control and Reclamation Act ("SMCRA"), which OSM is charged with enforcing. The record reflects that RCCC submitted its application to OSM on June 28, 2002, and that the ensuing year-long review of that application resulted in numerous revisions in response to public comments, notices of technical deficiencies, and comments from federal agencies. [Doc. 15 at pp. 11–12.]

RCCC's application sought permission "to conduct surface and auger mining on the Splint, Windrock, Walnut Mountain, Red Ash, and Braden Mountain coal seams." The proposed mining area is approximately 10 miles southwest of the town of Jellico and 0.5 miles northwest of the Elk Valley community. The proposed permit area is 2,107 acres, with approximately 1,148.7 acres to be disturbed during the 9.9–year life of the project. Much of the proposed permit area was previously surface mined between the late 1960's and the early 1980's with unreclaimed land remaining. The land is privately owned, with portions of the land leased for hunting and timber cutting, and some occasional recreational activities are permitted. [Doc. 1, Ex. 1 at pp. IV–1, 2, 4.] OSM provided a 30–day period for comments on the proposed application and a public hearing was held in the Elk Valley community. [Id. at p. IV–14.]

The permit was issued July 3, 2003, following a Finding of No Significant Impact ("FONSI") and an Environmental Assessment ("EA") issued by OSM on June 30, 2003 and July 2, 2003, respectively. [Doc. 1 at ¶ 33.] Among the many requirements of SMCRA, permit 3116 requires RCCC to reclaim over 412 acres of abandoned mine land which has been subjected to previous mining operations. [Doc. 22, Ex. A at ¶ 17.] The permit also addresses restrictions designed to enhance wildlife populations. [Doc. 1, Ex. 1 at pp. IV–19–24.]

RCCC submitted numerous affidavits and documentary evidence which relate to the economic benefits of this permit to RCCC, its suppliers and vendors, and the surrounding community. As the operation continues to grow, RCCC is increas-

ing the number of its employees and the number of suppliers and vendors. RCCC points out that, through the benefit of this permit, it is able to provide gainful employment to citizens of an economically depressed area, that it is required to contribute to a federal program for the reclamation of abandoned mine lands, and that it provides tax dollars to local and state governments. RCCC predicts that the revocation of its permit would have dire economic consequences to its employees, suppliers, vendors and the community. [Doc. 20 at pp. 4–5.]

Plaintiffs acknowledge the economic significance of RCCC's business to the community, but argues that in balancing such harm, the economic injury to RCCC is outweighed by the irreparable injury to the environment caused by RCCC's operation. [Doc. 21 at pp. 17–20.]

## II. *Standard of Review*

■ The parties agree that this Court has jurisdiction to review NEPA claims pursuant to the Administrative Procedure Act, 5 U.S.C. § 704.[1] The federal defendants, in particular, point out that the Court's review of a federal agency decision under the APA is a review of the administrative record and a determination, based on the administrative record, of whether that decision was arbitrary and capricious. 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, finding, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). *See Communities, Inc. v. Busey,* 956 F.2d 619, 623 (6th Cir.), *cert. denied,* 506 U.S. 953, 113 S.Ct. 408, 121 L.Ed.2d

332 (1992) ("agency decisions are set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "); *Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997) (same).

■ The defendants have represented that the administrative record in this case is over 7,000 pages and includes numerous maps. Accordingly, the administrative record has not yet been assembled and the federal defendants therefore argue that consideration of plaintiffs' motion for preliminary injunction is premature and that the Court cannot determine OSM's decision as arbitrary and capricious without the benefit of reviewing the administrative record. [Doc. 15 at pp. 14–15.] While the Court agrees that review under the APA is normally a review of the administrative record, *see Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"), the Court notes that plaintiffs' position is that the EA is deficient "on its face" and that the administrative record is unnecessary to determine the sufficiency of their claims. [Doc. 21 at p. 2.] Indeed, the plaintiffs specifically requested that the Court proceed with argument on the motion for preliminary injunction without waiting for the administrative record to be filed. Consequently, based on plaintiffs' request, the Court will consider whether plaintiffs are entitled to a preliminary injunction based on a review of the record as it currently exists, i.e., whether plaintiffs are likely to succeed on the merits that OSM's issuance

---

1. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Issuance of an environmental assessment (EA)

constitutes a "final agency action" for purposes of review under the Administrative Procedure Act. *Southwest Williamson County Cmty. Ass'n, Inc. v. Slater,* 243 F.3d 270, 274 n. 3 (6th Cir.2001).

of permit 3116 was arbitrary and capricious.

■ The parties agree that the Court should consider four criteria in assessing whether to issue a preliminary injunction. The Court must consider: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Southwest Williamson County Cmty. Ass'n, Inc. v. Slater,* 243 F.3d 270, 277 (6th Cir.2001) (quoting *McPherson v. Michigan High School Athletic Ass'n, Inc.,* 119 F.3d 453, 459 (6th Cir.1997)). A careful review of the record indicates that it is the first factor, the likelihood of success on the merits, which plaintiffs cannot satisfy at this stage and which will be the focus of this opinion.

## III. *The Parties' Positions*

Plaintiffs' briefs [Docs. 3, 21, 25] set forth several arguments why they are likely to succeed on the merits and therefore why they are entitled to a preliminary injunction. In essence, plaintiffs assert that OSM's decision to issue permit 3116 was arbitrary and capricious because OSM did not prepare an EIS for this project. Plaintiffs claim that OSM failed to properly consider alternatives to the proposed action and failed to fully explore the impacts of the proposed action.

RCCC argues that, although plaintiffs claim they want OSM to take a "hard look" at the environmental issues as required by NEPA, plaintiffs really just disagree with OSM's decision and such disagreement does not constitute an arbitrary or capricious decision. [Doc. 20.] RCCC also argues strenuously that revocation of its permit would cause serious, perhaps devastating, financial hardship on RCCC, its employees and vendors.[2]

The federal defendants similarly argue that OSM's decision not to prepare an EIS was neither arbitrary nor capricious; the direct and indirect impacts of the mining do not require the preparation of an EIS; the cumulative impacts of the mine permit do not require an EIS; and OSM did not violate NEPA in the manner and form of notification. [Doc. 22.]

## IV. *Analysis*

■ NEPA is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and is designed to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321; *Southwest Williamson County Cmty. Ass'n, Inc. v. Slater,* 243 F.3d 270, 278 (6th Cir.2001). NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Southwest Williamson County Cmty. Ass'n,* 243 F.3d at 274 n. 3. NEPA does not mandate a specific result; NEPA requires only that the agency follow the necessary process in assessing the environmental effects of such projects.

---

**2.** RCCC's brief also raised the argument that the Court does not have subject matter jurisdiction of plaintiffs' claims because plaintiffs failed to exhaust their administrative remedies under SMCRA. [Doc. 20 at pp. 5–7.] Plaintiffs' complaint, however, specifically alleges violations of NEPA, not SMCRA, and the Court is unaware of any requirement that exhaustion of SMCRA remedies is a condition precedent to recovery under NEPA.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *see Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–228, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) ("once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' "). An EIS is not, however, required for all federal actions and it is this issue—when an EIS is required and whether OSM should have prepared an EIS—that is at the heart of this case.

The NEPA regulations specifically provide that an agency may first prepare an environmental assessment ("EA"), a "concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."[3] 40 C.F.R. § 1508.9. Thus, the regulations instruct that an agency, after preparation of an EA, may either prepare an EIS *or* a FONSI. In the present case, the EA lead OSM to conclude that no EIS was necessary and a FONSI was issued.

■■■ OSM's decision that no EIS was necessary can be overturned only if the Court determines that it was arbitrary, capricious, or an abuse of discretion. *Kelley v. Selin,* 42 F.3d 1501, 1518 (6th Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995). OSM's decision must be "reasonable under the circumstances" when viewed "in the light of the mandatory requirements and the standard

set by NEPA." *Id.* at 1519. "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan,* 887 F.2d 689, 693 (6th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990). The Court may not substitute its judgment of the environmental impact of RCCC's operation for the judgment of OSM, assuming that OSM has adequately studied the issue. *Kelley,* 42 F.3d at 1518. The Court's role is to determine whether OSM "has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." *Id.* at 1518–1519; *see Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 194 (D.C.Cir.1991) ("Because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decision makers to reach certain results."). It is well settled that administrative decisions should be set aside "only for substantial procedural or substantive reasons as mandated by statute . . . , not simply because the court is unhappy with the result reached." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)).

As previously noted, an EIS is required for projects which "significantly affect the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine wheth-

---

**3.** NEPA created the Council on Environmental Quality (CEQ) which is charged with assessing federal programs and activities in light of the policy goals of NEPA. 42 U.S.C. §§ 4342, 4344. The CEQ has promulgated regulations to assist federal agencies in complying with NEPA. 40 C.F.R. Part 1500.

er a project "significantly" affects the environment requires consideration of both context and intensity. 40 C.F.R. § 1508.27. "Context" means that the significance of an action must be analyzed in several contexts such as society as a whole, the affected region, the affected interests, and the locality. *Id.* at § 1508.27(a). Intensity refers to the severity of the impact and numerous factors should be considered such as: both beneficial and adverse impacts; the degree to which the proposed action affects public health or safety; unique characteristics of the geographic area; the degree to which the environmental effects are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions; whether the action is related to other actions with cumulatively significant impacts; the degree to which the action may adversely affect listings in the National Register of Historic Places; the degree to which the action may adversely affect an endangered or threatened species; and whether the action threatens a violation of federal, state, or local law. *Id.* at § 1508.27(b).

In determining whether to prepare an EIS, the agency should look to its own procedures to determine whether the proposal is one which "normally" requires an EIS. 40 C.F.R. § 1501.4(a). Plaintiffs point to OSM's NEPA handbook which sets forth the following pertinent criteria for actions which "normally" require an EIS:

\*     \*     \*     \*     \*     \*

(3) Approval of a proposed mining and reclamation plan that includes any of the following:

(a) Mountain top removal operations.

(b) Mining within high use recreation areas.

(c) Mining that will cause population increases that exceed the community's ability to absorb the growth.

(d) Mining that would require a major change in existing coal transportation facilities.

(4) Approval of a proposed mining and reclamation plan for a surface mining operation that meets the following:

(a) The environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document covering the specific leases or mining activity; and

(b) The area to be mined is 1280 acres or more, or the annual full production level is 5 million tons or more; and

(c) Mining and reclamation operations will occur for 15 years or more.

[Doc. 1, Ex. 3 DM 8.3.] Both the federal defendants and RCCC argue, however, that the project at issue does not meet these criteria inasmuch as it is not a "mountain top removal operation" as defined by OSM[4]; it is not a "high use recreation area"; the permitted area to be disturbed is less than 1280 acres; and the project is expected to last less than 10 years. [Doc. 20 at pp. 9–10; Doc. 22 at pp. 8–11.] The EA and the Affidavit of Douglas K. Siddell of OSM confirm this assertion and the Court will not disagree with OSM's characterization of the project. Ac-

---

4. OSM's SMCRA regulations define mountaintop removal mining as "surface mining activities where the mining operation removes an entire coal seam or seams running through the upper fraction of a mountain, ridge, or hill, ... by removing substantially all of the overburden of the bench and creating a level plateau or a gently rolling contour with no high walls remaining, and capable of supporting postmining land uses in accordance with the requirements of this section." 30 C.F.R. § 785.14(b).

cordingly, OSM asserts that this project does not fall within the parameters of one that "normally" requires an EIS. Further, because OSM concluded that the project would not "significantly" affect the environment, OSM asserts that an EIS was not required for NEPA compliance. The Court, upon review of the record, cannot conclude that OSM's decision was arbitrary, capricious, or without a reasoned explanation in support of the decision.

Analysis of OSM's "hard look" at RCCC's application thus requires careful consideration of the EA and the FONSI. [Doc. 1, Exs. 1 & 2.] The FONSI is a two-page document which sets forth OSM's ultimate conclusion that RCCC's permit "would not have a long-term major impact on the quality of the human environment. Therefore, an environmental impact statement pursuant to Section 102(2)(c) of NEPA is not required." [*Id.*, Ex. 2.] This finding specifically relies upon and references the EA and further concludes that "[i]mpacts to environmental and socioeconomic resources resulting from the proposed surface coal mining and reclamation operations are predicted to be minor to moderate in the short-term while long-term impacts should be minimal." *Id.*

The EA, which is the focus of plaintiff's argument, is a 41–page document which discusses, in considerable detail, RCCC's proposed project, the potential environmental impacts of the project and the mitigating measures of the project. [Doc. 1, Ex. 1.] The EA acknowledges that RCCC's mining operation will cause both temporary and some permanent changes to the environment. [*Id.* at pg. IV–2.] The EA concludes, however, that "[p]roper implementation of the proposed operation and reclamation plan is predicted to prevent or minimize any adverse effects that may occur from the temporary and permanent changes." *Id.* The EA contains a detailed description of the existing environment of the permitted area including: topography, geology, and soils; vegetation, land use, and aesthetics; hydrology; fish and wildlife resources and threatened or endangered species; cultural and historic resources; air quality, socioeconomics, and public controversy; and wetlands, floodplains, and wild and scenic rivers. [*Id.* at pp. IV–3–14.] The Court cannot conclude that this analysis is insignificant.

The EA further contains a lengthy and detailed discussion of the environmental impacts expected from RCCC's proposed activity. Again, the Court cannot conclude that this analysis is insubstantial or without meaning. Indeed, the very language of the EA indicates that OSM considered both positive and negative impacts to RCCC's proposed operation. The EA specifically mentions several concerns about the project raised by public comment and input from other agencies, and the mitigating measures adopted to address those concerns. For example, the EA identifies mitigating measures adopted to protect federally endangered and threatened species, the Indiana bat and blackside dace respectively. [*Id.* at pp. IV–20–21.] In fact, the EA addresses in some manner each of the specific issues raised by the plaintiffs. While the plaintiffs may disagree with OSM's conclusions on those issues, the Court does not find the EA to be deficient, particularly in light of the general guidance provided by the regulations that an EA "[s]hall include brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b)

A final point about the plaintiffs' claims on the lack of an EIS. Contrary to plaintiffs' assertion, the EA does specifically reference OSM's programmatic EIS.

[*See* Doc. 22, Ex. 2.] OSM issued EIS–18 in March 1985 to analyze the comprehensive impacts on the human environment that would result from decisions on permit applications for surface coal mining in Tennessee. This programmatic EIS concluded that new mining operations in the regions covering Campbell and Scott Counties "would result in minor to moderate cumulative impacts." The EIS points out that much of this region had been previously mined and future operations would be beneficial due to OSM's requirement of reclamation. [*Id.* at p. xi.] The EIS further specifies that it "will form the basis for NEPA compliance for future decisions on permit applications." [*Id.* at p. 1–1.] Of particular significance to one of plaintiffs' arguments is OSM's specification of the alternatives available to OSM regarding individual permit applications:

- Approval of the permit application. Under this decision, a permit application would be approved without any conditions to bring the permit application package into full compliance with the Federal program regulations. For most permit applications, this decision is not a viable one, because it would result in OSM's issuing coal mining permits for which the necessary findings could not be made, and for which operations would not be in compliance with the performance standards of the Federal program.

- Approval with conditions to meet the requirements of SMCRA. Under this decision, conditions would be developed on a permit-by-permit basis to bring the deficient permit application package into full compliance with the Federal program regulations. Since it is typical for applications reaching the final stages of the permitting process still to contain minor deficiencies, this is OSM's preferred decision for individual permitting decisions.

- Disapproval of the permit. A permit application could be disapproved in those cases where the required findings cannot be made. Experience indicates that through the review process, during which additional information, plans, maps, etc., are required, and through imposition of conditions to the permit, it is possible to bring most permit applications into compliance with the regulatory program. Thus, it is not anticipated that this decision would be utilized in most cases.

- No action. The no action decision is not available to OSM as an alternative inasmuch as the Secretary is required to make decisions on all coal mining and reclamation permit applications.

[*Id.* at p. 2–1.] Thus, the "alternatives" identified in the EA (no action, permit approval, and permit disapproval) appear to be those appropriate as set forth in OSM's programmatic EIS. The Court will uphold an agency's "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington*, 938 F.2d at 196. The federal defendants indicate that the programmatic EIS has been re-examined twice since its issuance, in 1991 and 2003. OSM concluded both times that a supplemental EIS was not required. [Doc. 22, Ex. A ¶ 16.] Thus, a review of the programmatic EIS, which is incorporated by specific reference into the EA, further addresses plaintiffs' concerns and OSM's NEPA obligations.

■ As both RCCC and the federal defendants point out, NEPA does not require agencies to promote environmental concerns over other appropriate concerns; NEPA requires that the agency take the requisite "hard look" at the environmental consequences before taking a major action.

*Baltimore Gas & Elec. Co.,* 462 U.S. at 97, 103 S.Ct. 2246; *see Robertson,* 490 U.S. at 350, 109 S.Ct. 1835 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."). A review of the record and the EA leads the Court to conclude that OSM did indeed take a "hard look" at RCCC's application and the impacts of that proposed action. The Court cannot second-guess OSM's judgment on matters within its area of expertise and cannot conclude that OSM's decision was not "fully informed and well-considered." *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 558, 98 S.Ct. 1197. The EA contains sufficient analysis and information to provide a "reasoned explanation" for OSM's decision and the Court will not, on this record, overturn that decision.

The Court is certainly sympathetic to plaintiffs' concerns and notes the Supreme Court's admonition that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). OSM's decision to issue RCCC a permit to mine coal will inevitably have an impact on the environment. As the EA points out, however, OSM has analyzed most of those impacts to be minimal or short-term. The Court further notes that coal mining is an activity permissible by federal law within the confines of SMCRA and OSM's oversight. Disagreement with that policy decision, or the manner in which it is administered, may be more appropriately addressed to Congress and OSM. OSM's decision may

not be popular or even the conclusion the undersigned would have reached. Nevertheless, the Court must follow the *Amoco* admonition to focus on the underlying substantive policy of NEPA—to ensure that OSM took "a hard look" at RCCC's application—rather than insist on the statutory process of a full-fledged EIS. *Id.* at 544, 107 S.Ct. 1396.

## V. *Conclusion*

For all of the reasons set forth herein, the Court cannot conclude, based on a thorough review of the record, that OSM's decision to issue permit 3116 to RCCC was arbitrary or capricious. Accordingly, the Court cannot conclude at this time that the plaintiffs are likely to succeed on the merits of their claims and therefore plaintiffs' motion for preliminary injunction [Doc. 2] will be **DENIED.**

Order accordingly.