**COALITION AGAINST A RAISED EXPRESSWAY, INC., Plaintiff-Appellee, Cross-Appellant.**

**Downtown Mobile Unlimited, Mobile Historic Development Commission, Historic Mobile Preservation Society, Oakleigh Garden Society, East Church Street Development Assoc., Old Dauphin Way Association, Plaintiffs, Cross-Appellants,**

**National Trust for Historic Preservation, Plaintiff-Intervenor, Appellee,**

v.

**Elizabeth DOLE, in her official capacity as Secretary of the U.S. Department of Transportation, and Ray Barnhart, in his official as Administrator of the Federal Highway Administration, Defendants-Appellants, Cross-Appellees,**

**Royce G. King, in official capacity as Director of the State of Alabama Highway Department, Defendant-Appellant, Cross-Appellee.**

No. 86-7892.

United States Court of Appeals, Eleventh Circuit.

Jan. 13, 1988.

Edward J. Vulevich, Jr., Asst. U.S. Atty., Mobile, Ala., Jacques B. Gelin, Appellate Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., James E. Scapellato, Regional Counsel, Federal Highway Adm., Atlanta, Ga., for Dole.

Jack F. Norton, Jerry Weidler, Montgomery, Ala., for State of Ala.

Wade B. Perry, Jr., Johnstone, Adams, Bailey, Gordon & Harris, W. Alexander Gray, Jr., Mobile, Ala., Barry J. Cutler, O'Connor & Hannan, Washington, D.C., for Coalition, et al.

Elizabeth Merritt, David A. Doheny, Washington, D.C., for National Trust for Historic Preservation.

Before FAY, Circuit Judge,
HENDERSON [*], Senior Circuit Judge,
and FORRESTER [**], District Judge.

[*] See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable J. Owen Forrester, U.S. District Judge for the Northern District of Georgia, sitting by designation.

1. The plaintiffs in this case include the Coalition Against a Raised Expressway, the Downtown Mobile Unlimited, Mobile Historic Development Commission, Historic Mobile Preservation Society, Oakleigh Garden Society, East Church Street Development Association, and Old Dauphin Way Association. The National Trust for Historic Preservation later intervened in this action as plaintiffs. The term "plaintiffs" will refer to all these groups.

2. The defendants are Elizabeth Dole, Secretary of the Department of Transportation ("DOT"),

FAY, Circuit Judge:

Plaintiffs [1] appeal the district court's holding that the Federal Highway Administration ("FHWA") made a good faith study of the alternatives to and the impacts of an elevated downtown expressway, as well as the holding that the FHWA complied with the cooperative planning process mandated by 23 U.S.C. § 134 (1982). Defendants [2] appeal the decision of the district court to enjoin the construction of the expressway until they comply with section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303 (1982) (section "4(f)"). [3] We affirm the judgment of the district court on all three issues.

## I. BACKGROUND

The raised expressway at issue in this case will connect I–10 in downtown Mobile, Alabama to I–65 in Prichard, Alabama and will be known as I–210. The FHWA currently proposes to build the southern segment of the highway above Water Street, a six-lane arterial road that runs north-south. To the east of the proposed route lies the Mobile River and to the west is located Mobile's central business district. The Government Street Park and several historical buildings including the Mobile City Hall and the G.M. & O. Railroad Terminal are immediately adjacent to the elevated freeway.

Since the 1950's, the City of Mobile has desired a connector between I–10 and I–65. On October 9, 1980, Congress finally passed a law authorizing federal funding

Ray Barnhart, Administrator of the FHWA, and Ray Bass, the director of the State of Alabama Highway Department ("AHD").

3. Section 4(f) was originally codified at 49 U.S.C. § 1653(f). Congress later repealed and recodified section 4(f) without substantial change at 49 U.S.C. § 303. Act of Jan. 12, 1983, Pub.L. No. 97–449, § 303, 96 Stat. 2413, 2419. Intervenor National Trust for Historic Preservation also invokes 23 U.S.C. § 138 (1982) which is virtually identical to 49 U.S.C. § 303. *See Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 704 n. 2 (11th Cir.1985). Throughout this opinion the term "section 4(f)" will refer to both statutes.

for the construction of a connector. The Department of Transportation and Related Agencies Appropriation Act, 1981, Pub.L. No. 96–400, § 310, 94 Stat. 1681, 1696–97 (1980). On November 20, 1980, the FHWA approved the addition of I–210 to the interstate system. Between November 1981 and March 1982, the AHD and FHWA held several public meetings concerning I–210.

The Mobile City Commissioners, however, became concerned that the construction of the southern segment of the expressway would adversely affect downtown redevelopment. To publicize their opposition, the city commissioners issued a joint resolution on April 1, 1982 opposing the expressway. The city commissioners subsequently ratified the resolution after the FHWA circulated a draft environmental impact statement ("EIS").

Later, the FHWA issued the final EIS and adopted the elevated expressway as its preferred alternative. On December 1, 1983, the FHWA added as an addendum a report on the harmful effects of raised expressways experienced by other large cities in their redevelopment prospects. The FHWA formally approved the final EIS and the preferred alternative on May 10, 1984. Two of the alternatives that the FHWA rejected in favor of the elevated downtown expressway were a proposal to create a "spur" by widening Water Street and adding turning lanes, and a proposal to build the expressway on nearby Blakely Island. In choosing the elevated downtown expressway, the FHWA did not make the determinations required by section 4(f). The FHWA believed that the proposed route for I–210 did not trigger the application of section 4(f).

On October 25, 1984, plaintiffs filed suit in the district court to enjoin the construction of I–210. Both plaintiffs and defendants eventually stipulated that the case did not involve any disputed facts and moved for summary judgment. The district judge

found that Section 4(f) was applicable and that the government failed to comply with it, but found for the government on all other claims. Both sides appeal the district court's order to this court.[4] Since there are no contested facts, we decide all issues as a matter of law, giving plenary review to the district court's findings. *Bailey v. Carnival Cruise Lines, Inc.*, 774 F.2d 1577, 1578 (11th Cir.1985).

## II. GOOD FAITH STUDY

Plaintiffs' first issue on appeal is that the defendants violated the National Environmental Policy Act of 1969 ("NEPA") §§ 101–105, 42 U.S.C. §§ 4331–4335 (1982). Plaintiffs argue that the government did not properly consider the impact of the elevated expressway on downtown Mobile. Plaintiffs also claim that the government did not give enough consideration to the alternative "spur" and the Blakely Island routes.

In every "major Federal action significantly affecting the quality of the human environment" the federal government is required to make an EIS. 42 U.S.C. § 4332(2)(C) (1982). In the EIS, the government is required to include a "detailed statement" on

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.* The courts may only examine the EIS to ensure that the government "with good

---

**4.** Plaintiffs do not appeal the district court's finding that the government complied with the Federal–Aid Highway Act § 8, 23 U.S.C. § 128 (1982); the National Historic Preservation Act of 1966 § 106, 16 U.S.C. § 470f (1982); and the noise control regulations of the DOT, 23 C.F.R.

§ 772 (1987). Because the district court found that the government failed to comply with section 4(f), the court never addressed the question of whether the government complied with section 110(f) of the National Historic Preservation Act, 16 U.S.C. § 470h–2(f) (1982).

faith objectivity has taken a hard look at the environmental consequences of a proposed action and at alternatives to that action." *Druid Hills Civic Association v. Federal Highway Administration,* 772 F.2d 700, 708 (11th Cir.1985) (quoting *Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority,* 576 F.2d 573, 575 (5th Cir.1978) (per curiam)). When challenging an EIS as defective, the plaintiffs have the burden of persuasion. *Druid Hills,* 772 at 709 n. 9.

■ Plaintiffs' first claim under NEPA centers around the alleged failure of the FHWA and AHD to examine in good faith the effect of a raised expressway on downtown redevelopment. The main thrust of the argument centers around the FHWA's failure to include in the EIS a 1980 federal study on the harmful effects that elevated expressways have had on downtown redevelopment in other cities. The FHWA later added the report as an addendum to the final EIS. Plaintiffs contend, however, that FHWA's failure to publicize the damaging report earlier illustrates bad faith.

In our view, including the 1980 report only as an addendum does not prove a lack of good faith. After the FHWA added the 1980 report to the EIS in December, 1983, the federal government extended the time for public comments and hearings from February 10 to May 7, 1984. The FHWA announced the time extension in the Federal Register and the local newspapers.

When the government finally selected the preferred route for I-210, it had adequately evaluated the 1980 report and the comments that the report had generated. Because the government gave ample time for public comments after including the report in the EIS, the failure to publicize the 1980 report earlier neither proves that the defendants tried to hide the highway's adverse impact on Mobile's downtown redevelopment nor that the defendants compiled the final EIS in bad faith.

■ Plaintiffs' second NEPA argument is more disturbing. Plaintiffs claim that the FHWA did not examine the "spur" and Blakely Island alternatives in good faith. Plaintiffs allege that the motive for FHWA's bad faith was FHWA's belief that the congressional legislation did not authorize funding for a "spur" but only for a connector that could meet federal interstate standards. Plaintiffs suggest that this belief influenced the FHWA to incompletely investigate the "spur" alternative. Plaintiffs also claim that the approaching statutory deadline tempted the FHWA to curtail the study.[5] After providing a motive, plaintiffs attempt to prove the inadequate study with various memoranda from the administrative record. In these memoranda lower officials of the FHWA stated that the "spur" and Blakely Island alternatives should only be studied until they can be proven unfeasible.[6] Plaintiffs claim

---

**5.** The FHWA was obligated to finish the EIS by September 30, 1983. Surface Transportation Assistance Act of 1978, Pub.L. No. 95–599, § 107(d), 92 Stat. 2689, 2694.

**6.** Set out below are excerpts of two letters and the minutes of a meeting mentioned by plaintiffs. The first letter is from Gary Hamby, a District Engineer of the FHWA, to B.H. Boydston, an assistant in the AHD. The letter is dated March 3, 1982.

Espy told Don Vaughn to make sure that the consultant had some facts and figures about [the spur] possibility available but no such word should be released to the public. The State is doing a computer run for traffic assignments in the area. The consultant will take the traffic assignments and the information they already have and refine it so it will be available when and if this comes up. I do not think that this is an inappropriate expenditure of project funds as *this alternative must*

*be sufficiently developed to be eliminated in the EIS anyway,* and most of this work is already done.

Vaughn is aware that the FHWA position is firmly against changing to a spur. It would severely limit the benefits of the proposed highway from a local service standpoint and the overall integrity of the Interstate system. In the interim, we are proceeding with the project as presently defined by law. (Emphasis added).

The second piece of evidence, the minutes of a meeting held on March 15, 1982, contains the following paragraph:

The question was raised if [sic] the State should ask the Consultants to make any studies of the spur concept at this time. After some discussion, it was decided that the Highway Department should provide traffic projections for a spur termination at Beauregard Street and allow the Consultants to make very cursory studies of the feasibility of the con-

that these memoranda prove FHWA's lack of good faith in studying the alternatives to a downtown expressway.

The FHWA acknowledges that it had a duty to study the "spur" or Blakely Island routes. The question, therefore, is whether the FHWA conducted the study in good faith. The facts surrounding this question are very similar to the facts in *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army*, 492 F.2d 1123 (5th Cir.1974).[7] In *Environmental Defense Fund*, a group of environmentalists challenged a navigation project. The environmentalists claimed that the government decided to proceed with the project before completing the EIS. To prove that the EIS was only a mere formalism, the environmentalists produced two letters written by a district engineer. *Environmental Defense Fund*, 492 F.2d at 1128–29. The court examined the letters and found that they only expressed an allowable "confidence" that the project would ultimately be accepted. The court stated that the letters did not suggest that the Corps of Engineers would fail to reconsider the project once it completed the EIS. *Id.* at 1129.

Viewing the letters presented here in the context of the voluminous administrative record, we find that the FHWA also merely expressed a confidence that the alternatives ultimately would turn out to be unfeasible. The FHWA simply stated its view that once proven unfeasible, further research would be unnecessary. We also note that the letters indicated that the FHWA would save the accumulated evidence for reevaluation should the alternatives ultimately prove viable.

The evidence shows that this "confidence" was not unreasonable, since studies showed that the Blakely Island route would destroy wetlands and that the "spur" would inadequately serve the high level of traffic. Other documented problems with the alternatives included decreased safety and increased fuel consumption. The "confidence" of the FHWA, borne from their experience and expertise, appears not to have been misplaced.

The record also shows that the FHWA took a hard look at the alternatives. The record contains a large quantity of scientific data. There is no evidence that the FHWA cut short its efforts to accumulate evidence in order to meet the statutory deadline. The final EIS that resulted from the study fulfilled its purpose of providing the ultimate decisionmaker with sufficient environmental information to aid in choosing between the various alternatives. *See Druid Hills*, 772 F.2d at 708; *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir.1975). In sum, the government obtained ample scientific evidence, and its experts simply expressed a confidence that the alternatives would prove unfeasible. We cannot say that the few letters presented are sufficient to prove that the FHWA was so committed to the raised expressway that it studied the other alternatives in bad faith.

## III. THE COOPERATIVE PLANNING PROCESS

■ Plaintiffs' second major contention on appeal is that the district court erred in not finding a violation of the Federal Aid Highway Act, 23 U.S.C. § 134 (1982). Section 134 states that the Secretary of Transportation shall not approve a highway project in an urban area "unless [s]he finds that such projects are based on a *continuing comprehensive* transportation planning process carried on *cooperatively* by States

cept. *This information would be kept in house for the use of decision makers in the event that the question of the viability of a spur should resurface in the future.* (Emphasis added).
The final letter is also from Hamby to Boydston. It was written on May 14, 1982. In the letter Hamby states that the consultant will investigate the Blakely Island route "and document this option to the point where it can be proven unfeasible." The letter also says that

"[a]lthough not permitted by law, [the spur] will be explored sufficiently to determine if it is feasible. This is being done to enable the Department to adequately respond to the advocates of this [spur] scheme."

7. The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

and local communities in conformance with the objectives stated in this section." (emphasis added). Section 134 also forbids the construction of an urban highway "unless the responsible public officials of such urban area in which the project is located have been consulted and their views considered with respect to the corridor, the location, and design of the project." Section 134 is known as "the 3C's requirement" because it mandates continuing, comprehensive and cooperative planning. To maintain a city's eligibility for federal funding, the DOT must certify that the planning met the 3C's requirement. *Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission,* 599 F.2d 1333, 1340 (5th Cir.1979).

The regulations promulgated pursuant to section 134 call for local city officials and the governor to create a metropolitan planning organization ("MPO"). 23 C.F.R. § 450.106 (1987). The MPO is designated as "the forum for cooperative transportation decisionmaking." 23 C.F.R. § 450.104(b)(3) (1987). Both the MPO and the state must certify whether the planning process meets the 3C's requirements 23 C.F.R. § 450.114(c) (1987). If the MPO or the state identify any deficiencies in the planning process, these deficiencies are to be corrected within a reasonable, self-imposed time frame. 48 Fed.Reg. 30,336 (1983). Whether the MPO and the state certify to compliance or noncompliance with the 3C's, the DOT must still make its own independent assessment of the planning process. *See D.C. Federation of Civic Associations v. Volpe,* 459 F.2d 1231, 1240 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). The DOT will take into account the certification by the MPO and the state, but does not have to reach the same conclusion. 48 Fed.Reg. 30,336 (1983).

Plaintiffs attack the DOT's finding that the planning process was "cooperative." The basis for the attack arises from the inconsistency between the Mobile City Planning Commission's ("MCPC's") plan and the MPO's plan regarding the southern

segment of I-210.[8] Among other things, the MCPC's comprehensive plan failed to include an elevated expressway along the downtown waterfront. The MPO's plan, however, did provide for the expressway.

Noting the discrepancies between the plans of the city government and the MPO, the state certified to compliance with the 3C's only on the condition that the discrepancies be resolved. The state established one year as a reasonable time for resolution. The MCPC and the MPO never completely resolved the inconsistencies; however, and the state continued to conditionally certify to cooperation for the next two years. The plaintiffs, therefore, also attack the failure to correct the inconsistencies within a reasonable time as a violation of the DOT's own regulations.

■ There is no dispute over the applicable standard of review; both parties agree that we cannot overturn the FHWA's finding of cooperation unless it is arbitrary and capricious. We do not believe that the FHWA's finding in this case is arbitrary. Cooperation does not equal consistency. The congressional purpose behind the 3C's requirement was to provide an outlet for the opinions of local governments and to force the FHWA to consult with the local leaders. The statute was not intended to impose requirements on the completed plans but only to regulate the planning process. H.R.Rep. No. 1948, 87th Cong., 2d Sess. 12–13 (1962). When an inconsistency occurs, the FHWA within its discretion either may view the inconsistency as evidence of non-cooperation or, if there is supporting evidence, may view the inconsistency as occurring in spite of the best efforts of cooperation. *See Stop H–3 Association v. Brinegar,* 389 F.Supp. 1102, 1115 (D.Haw.1974), *rev'd on other grounds,* 533 F.2d 434 (9th Cir.) *cert. denied,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976).

■ In this instance there is sufficient evidence of consultation and attempts to cooperate. All of the local governments in the area had representatives on the MPO.

---

**8.** The MCPC is a part of the Mobile City government.

The administrative record is replete with letters between the MPO and local government. These letters demonstrate the awareness and consideration that each organization had for the other organization's plan.

The length of time required to resolve the inconsistency also did not violate the regulations. During the three years of conditional certification, the MCPC and MPO settled forty-five differences between the two plans, leaving only the dispute over the elevated expressway. The final inconsistency shows potential for resolution. The Mobile City Council recently passed a resolution requesting that the MCPC amend its plan to resolve the final inconsistency. In view of the foregoing it was not arbitrary for the DOT to conclude that the inconsistencies were being resolved within a reasonable time frame and that the planning process was continuing, comprehensive and cooperative.[9]

## IV.  SECTION 4(f)

The only issue that the defendants appeal is the requirement that they comply with section 4(f) of the Department of Transportation Act. Section 4(f) forbids the construction of a highway that "uses" a public park or land of an historic site unless

    (1) there is no feasible and prudent alternative to the use of such land, and

    (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

49 U.S.C. § 303 (1982). Section 4(f) is triggered if the highway either directly or indirectly uses the protected land. *See Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 84–85 (5th Cir.1976). Indirect impacts that might be sufficient to constitute a "use" include noise pollution, general unsightliness, and the reduction of access to the protected area. *See, e.g., Louisiana Environmental Society,* 537

F.2d at 85 (blocking view of lake from nearby homes); *Monroe County Conservation Council, Inc. v. Adams,* 566 F.2d 419, 424 (2d Cir.1977) (limiting access to park from nearby residential area), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 362 F.Supp. 627, 639 (D.Vt.1973) (bordering a national forest) *aff'd,* 508 F.2d 927 (2d Cir.1974), *vacated and remanded on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Citizens for Mass Transit Against Freeways v. Brinegar,* 357 F.Supp. 1269, 1280 (D.Ariz.1973) (placing freeway next to park). Both parties agree that the proper test is whether the proposed highway "substantially impairs" the public utility or historical significance of the property in question. *See Citizen Advocates for Responsible Expansion, Inc. (I-CARE) v. Dole,* 770 F.2d 423, 441 (5th Cir.1985); *Adler v. Lewis,* 675 F.2d 1085, 1092 (9th Cir.1982).

What the parties do not agree on is the standard of review that we should apply to the Secretary of Transportation's decision that she need not comply with section 4(f). Defendants urge us to overrule the decision only if it is arbitrary or capricious. Plaintiffs argue that we may only uphold the Secretary's decision if it is reasonable. We agree with plaintiffs that the proper standard of review is one of reasonableness.

The administrative decision to comply with section 4(f) is very similar to the decision to comply with NEPA. Under NEPA, an agency must complete an EIS if a federal action "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1982). When an agency decides that it need not complete an EIS because it believes that the project will not cause significant effects, then this circuit has consistently reviewed the agency's decision under a reasonableness standard. *See e.g., Manasota-88, Inc. v. Thomas,* 799 F.2d 687, 691–92 & n. 7 (11th Cir.1986); *National Wildlife Federation v. Marsh,*

---

**9.**  We note that in *Atlanta Coalition* several years of conditionally certifying to compliance with

the 3C's did not jeopardize the cities eligibility for federal funding.  599 F.2d at 1341 n. 10.

721 F.2d 767, 782 (11th Cir.1983); *Sierra Club v. Hassell*, 636 F.2d 1095, 1097–98 (5th Cir. Unit B 1981); *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465–66 (5th Cir.1973). We see no good reason why an agency's determination that section 4(f) does not apply should not also be subject to a reasonableness test. The decision under both statutes is jurisdictional and the only difference in the analysis is the degree of impact required for "significant effect" versus "use." [10] At least two other circuits have applied a reasonableness test for section 4(f) compliance. *I–CARE*, 770 F.2d at 441 (Fifth Circuit); *Adler*, 675 F.2d at 1092–93 (Ninth Circuit). *But see, Falls Road Impact Committee Inc. v. Dole*, 581 F.Supp. 678, 685 (E.D.Wis.1984) (Implying that an arbitrary standard for Section 4(f) compliance is required since Seventh Circuit precedent establishes an arbitrary standard for determining if an EIS is required.), *aff'd per curiam*, 737 F.2d 1476 (7th Cir.1984).

We will examine several specific properties to see whether the Secretary reasonably concluded that an elevated expressway along Water Street would not significantly impair these sites. The most important building at issue is the Mobile City Hall, which was designated as a National Historic Landmark in 1973. Constructed in 1858, it is currently the oldest continually operating city hall in the United States. A second significant building is the G.M. & O. Railroad Terminal. Built in 1907, it highlights a Spanish revival style of architecture with numerous arched openings. It is capped by a large dome that is a visual landmark. The railroad terminal was listed in the National Register of Historic Places in 1975. The final property is the Government Street Park. The park lies between Water Street and the river in a small area of land. The park's most promi-

nent feature is an observation deck that allows visitors to view the Mobile River. The government does not contest that Section 4(f) protects the park, the railroad terminal and the city hall.

We hold that the impacts from the raised expressway are substantial enough to constitute a constructive use of the city hall, the railroad terminal and the park.[11] All three properties are immediately adjacent to the freeway which would be situated on seventeen foot tall concrete pillars. One of the proposed exit ramps would pass within forty-three feet of the city hall building. Because the properties would be so near to the expressway, they would be especially susceptible to its adverse impacts.

Defendants contend that the impacts are not substantial in light of the properties' location in the midst of a busy downtown area. Defendants point out that I–10 with its noise and congestion is not very far away. Defendants emphasize that Water Street is heavily travelled. Because of the shipping, there are also warehouses, cranes, and loading docks nearby. The defendants imply that the raised expressway would only marginally increase the negative impacts already present in the downtown area.

The evidence in the administrative record shows, however, that the proposed highway would significantly increase the negative impacts on the city hall, the railroad terminal, and the park. The highway would add to the number of cars, truck and buses that pass alongside these properties. The record shows that as a result of the additional vehicles, air pollution would rise in nearby areas and the park would experience an increase in future carbon monoxide levels. *See* Final EIS at IV–19 & IV–59.

More importantly, noise levels would rise significantly. The final EIS predicts that the noise level for these properties would

---

10. We note that the functions of NEPA and Section 4(f), once triggered, are very different. NEPA is procedural and requires the gathering of evidence on environmental impacts of a federal action while Section 4(f) requires that parklands and historical sites be given paramount importance in the decision-making process. *Druid Hills*, 772 F.2d at 713 n. 15.

11. We note that there are other properties protected by section 4(f) in the downtown Mobile area. We do not need to decide whether each of those properties would be significantly impaired. The facts surrounding the city hall, the railroad terminal, and the Government Street Park are sufficient to show that section 4(f) has been triggered.

rise to between seventy-five and eighty decibels. *Id.* at IV–36. This is substantially greater than the Environmental Protection Agency's goal of fifty-five decibels. *Id.* at VI–32.[12] We believe that the significant increase in noise would adversely affect each protected property.

In addition to the noise and air pollution, the raised highway would impact on the protected sites by impairing the view. The highway would cut off the city hall's view of the river and the docks. Conversely, it would reduce the view from the river of the city hall's architecture. For the park and the railroad terminal, the highway would replace the view of downtown with the sight of the seventeen foot concrete pillars holding up the freeway. In addition, the dirt and debris from an elevated freeway would lessen the beauty of the architecture itself.

While the elimination of the view, the increase in noise and air pollution, and the close location of the highway may not individually constitute a use; cumulatively they significantly impair the utility of the properties. We understand the government's argument that downtown Mobile is not an unsullied area; however, a freeway raised seventeen feet in the air and adjacent to these protected properties would inevitably have a further adverse impact on the sites. It is unreasonable for the FHWA to claim that it does not "use" the park, the city hall and the railroad terminal. The FHWA must comply with Section 4(f) and find a "feasible and prudent alternative" to the expressway, or if that fails begin "all possible planning to minimize [the] harm." 49 U.S.C. § 303.

## V. CONCLUSION

We are not authorized to decide where this connector should be built. We are required to decide, however, whether the government made its decision in conformance with the law. We find that the EIS

study conducted by the defendants was done in good faith. We uphold the Secretary of Transportation's finding that the planning for the expressway "cooperative." We conclude that the defendants must comply with section 4(f) because the raised freeway will constructively use parkland and historical buildings. The record amply supports the rulings of the district court.

AFFIRMED.

---

12. The FHWA must attempt to mitigate the noise when the level exceeds 70 decibels. *See* Final EIS at VI–32. Even though the highway would push the noise level above this threshold, however, the FHWA would probably not utilize any noise abatement procedures such as constructing a massive concrete wall because the abatement procedures would create other adverse impacts for the sites. *Id.* at IV–44.