155 F.3d 1153
 29 Envtl. L. Rep. 20,219, 98 Cal. Daily Op.
Serv. 7300,
98 Daily Journal D.A.R. 10,104
 PRESIDIO GOLF CLUB, Plaintiff-Appellant,
v.
NATIONAL PARK SERVICE, an agency of the United States;
Department of the Interior, an agency of the United States;
Robert Chandler, General Manager of Presidio Project,
National Park Service; Brian O'Neill, General
Superintendent, Golden Gate National Recreation Area,
National Park Service; Roger G. Kennedy, Director, National
Park Service; Bruce Babbitt, Secretary, Department of the
Interior, Defendants-Appellees.
 No. 97-16703.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 12, 1998.
Decided Sept. 21, 1998.
 
 Nicholas C. Yost, Sonnenschein, Nath & Rosenthal, San Francisco, California, for plaintiff-appellant.
 Ronald M. Spritzer, United States Department of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Maxine M. Chesney, District Judge, Presiding. D.C. No. CV-96-04071-MMC.
 Before: CHOY, PREGERSON, and BOOCHEVER, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 The Presidio Golf Club ("Club") appeals the district court's summary judgment in favor of the National Park Service, the Department of the Interior, and related federal government officials, in the Club's action challenging the environmental and historic review process undertaken by the government and its concessioner, Arnold Palmer Golf Management Company, in connection with efforts to build a new public clubhouse at the Presidio Golf Course of San Francisco, near a century-old private Clubhouse which the Club seeks to preserve. The Club asserts violations of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), and the National Historic Preservation Act, 16 U.S.C. § 470 et seq. ("NHPA"). The Park Service challenges the Club's standing to sue under these statutes and the Administrative Procedures Act, 5 U.S.C. § 702.
 
 I. Facts
 
 2
 In 1895, the San Francisco Golf Club received permission from the military to build the Presidio Golf Course on the grounds of the Presidio. The San Francisco Golf Club built the Presidio Golf Clubhouse in 1899 on private land abutting the Presidio, at the edge of the golf course. In 1919, the Presidio Golf Club, a California non-profit corporation, purchased the Clubhouse and has since maintained it as a private club. Military officers were permitted to join the Club at discounted rates, although in later years some instead used locker and lounge facilities at a cluster of buildings constructed in the 1950s by the Army near the private clubhouse (the "army golf course buildings").
 
 
 3
 By agreement, Club members and armed forces personnel together enjoyed exclusive use of the Presidio Golf Course until the Presidio was deactivated in 1994. At that time, the Presidio was transferred to the National Park Service, which opened the golf course to public use and curtailed the Club's preferential access. In 1995, the Park Service contracted with Arnold Palmer Golf Management Company ("Palmer Golf") to manage the golf course. The loss of preferential access to tee times by Club members significantly undercut the value of Club membership because, according to Palmer Golf, public demand "exceeds available tee times at the Presidio by a factor of 20 to 1."
 
 
 4
 In May 1996, the Park Service released to the public an Environmental Assessment ("EA"), which described plans for new public facilities at the golf course. Four of the existing Army golf course buildings were to be demolished, and replaced with a 6,000-square-foot public clubhouse.
 
 
 5
 In November 1996, the Club filed suit, seeking declaratory and injunctive relief. The Club contends that the Park Service failed to comply with NEPA by not preparing an adequate EA followed by an Environmental Impact Statement ("EIS") evaluating the impact of the proposed new public clubhouse on the old private Clubhouse. The Club also contends that the Park Service did not comply with NHPA by failing to consider that the building of the public clubhouse may lead to the neglect and destruction of the old private Clubhouse, which is concededly eligible for inclusion in the National Register of Historic Places. The Park Service challenged the Club's standing to sue under NEPA and NHPA.
 
 
 6
 On cross-motions for summary judgment, the district court held that the Club had standing because it is located in the vicinity of the proposed new clubhouse, and determined that the Park Service's conclusions in the EA and its "finding of no significant impact" were neither arbitrary nor capricious.
 
 DISCUSSION
 II. Presidio Golf Club's Standing
 
 7
 The Park Service contends that the Club lacks standing to sue under both NEPA and NHPA. The "irreducible constitutional minimum" for standing in an Article III court requires:
 
 
 8
 (1) that the plaintiff have suffered an "injury in fact"an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of-the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 9
 Bennett v. Spear, 520 U.S. 154, ----, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997). In addition to the constitutional standing limitations, the courts have erected prudential barriers, "such as the general prohibition on a litigant's raising another person's legal rights, ... and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).
 
 
 10
 The Park Service contends (A) that the Club lacks standing because any future injury to the club would be a purely economic competitive injury which is not within the zone of interests to be protected by NEPA or NHPA; (B) that the Club lacks standing in its representative capacity based on injury to its members; and (C) that any future injury would be "self-inflicted," as well as "conjectural and speculative," and therefore not fairly traceable to the actions of the defendant.
 
 A. Zone of interests
 
 11
 The Park Service characterizes the Club's claim as one solely for an alleged "competitive injury" to purely economic interests outside the zone of interests sought to be protected by NEPA and NHPA. Purely economic interests do not fall within the zone of interests to be protected by NEPA or NHPA. Western Radio Services Co. v. Espy, 79 F.3d 896, 902-03 (9th Cir.) ("NEPA's purpose is to protect the environment, not the economic interests of those adversely affected by agency decisions.") (quotations omitted), cert. denied, --- U.S. ----, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996).
 
 
 12
 The APA, 5 U.S.C. § 702, grants federal court standing to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." The Supreme Court has interpreted this to require that the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).
 
 
 13
 "To find that the [plaintiff's interests] do not fall inside the 'zone of interests' protected by NEPA, we would have to find that (1) the [plaintiff's] interests are inconsistent with the purposes of NEPA, and that (2) the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit." Douglas County v. Babbitt, 48 F.3d 1495, 1500 (9th Cir.1995), cert. denied, 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996).
 
 
 14
 The Club urges that its interests at stake are not merely economic but include such other interests as the preservation of their historic building and its surrounding environment, and that these interests fall within the zone of interests of environmental quality and historic preservation sought to be protected by the statutes. Because the zone of interests test is "not a demanding one," Chief Probation Officers of Cal. v. Shalala, 118 F.3d 1327, 1331 n. 2 (9th Cir.1997), and the asserted interest need only be "arguably within the zone of interests to be protected or regulated by the statute," Data Processing, 397 U.S. at 153, 90 S.Ct. 827 (emphasis added), a rough correspondence of interests is sufficient.
 
 
 15
 The Park Service characterizes the Club's purpose, defined in its incorporation papers, as limited to "socializing and gathering to play the sport of golf." The 1919 Articles of Incorporation provide that the "purposes for which [the Club] is formed are to acquire, improve and maintain grounds and buildings for athletic purposes and to acquire and maintain a club house for social intercourse among its members...." NEPA's stated purposes include: "To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man...." 42 U.S.C. § 4321.
 
 
 16
 Congress enacted NHPA based on its findings that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people." 16 U.S.C. § 470(b)(2). NHPA was enacted to "encourage the public and private preservation and utilization of all usable elements of the Nation's historic built environment." 16 U.S.C. § 470-1(5).
 
 
 17
 The Club's stated purpose to "improve and maintain grounds and buildings for athletic purposes" implies the corollary purpose of maintaining an environment, both natural and built, suitable for the game of golf and post-game activities. A golf club attempts to create a rustic enclave for the rest and relaxation of its members. These interests of the enterprise are aligned with those of NEPA, to "encourage ... enjoyable harmony between man and his environment" and to "stimulate the health and welfare of man." 42 U.S.C. § 4321.
 
 
 18
 Similarly, the historic Tudor Clubhouse provides far more than food, beverages, and shelter. It functions as a mock country manor for the rustication of its members and, consistent with the purposes of NHPA, it is "preserved as a living part of ... community life." 16 U.S.C. § 470(b)(2). NHPA's goal to "encourage the ... private preservation and utilization of ... the Nation's historic built environment" is also furthered. 16 U.S.C. § 470-1(5) (emphasis added). Therefore, the Club's interests in maintaining its historic Clubhouse and the surrounding environment in a fashion suitable for the game of golf, are arguably within the zones of interests to be protected by NEPA and NHPA. The interests the Club seeks to protect in this litigation are not "inconsistent with the purposes of NEPA;" nor are the Club's interests "so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit." Douglas County, 48 F.3d at 1500.
 
 B. Organizational standing
 
 19
 A membership organization can sue in its representative capacity when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Com'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
 
 
 20
 The Park Service contends that the Club cannot assert this claim on behalf of its members because the interests it seeks to protect are not germane to the organization's purpose: "the stated purposes of the corporation do not include any environmental or historical objectives." However, the individual members' interests are largely identical to the organization's goals of maintaining the Clubhouse for the members' use in a manner suitable for the social and athletic activities surrounding the game of golf. The members are the actual beneficiaries of the rustic and historical ambience of the Clubhouse. If the Club's interest in maintaining the historical and environmental integrity of the Clubhouse falls within the zones of interests to be protected by NEPA and NHPA, so do the interests of its members. Further, courts have generally found the germaneness test to be undemanding. Humane Soc'y of the United States v. Hodel, 840 F.2d 45, 58 (D.C.Cir.1988) (as amended) ("It remains only to note that in thus characterizing the germaneness requirement as mandating mere pertinence between litigation subject and organizational purpose, we join a number of other courts which ... have declared it undemanding") (collecting cases).
 
 
 21
 Finally, there is no apparent reason why the participation of individual members should be necessary. The interests and claims asserted in this lawsuit on behalf of individual members are undifferentiated among members and similar to the interests and claims of the Club. The relief sought is to enjoin the project until its impact upon the Clubhouse has been adequately studied, and does not vary so as to require the individual participation of members, as it might were damages sought.
 
 
 22
 C. Whether the injury is "fairly traceable" to the Park Service
 
 
 23
 The Park Service contends that the injury asserted by the Club is not fairly traceable to the building of the public clubhouse. In its complaint, the Club quotes a letter from the Club's President Michael St. Peter to the Park Service to explain the injury that it asserts will flow from the Park Service's alleged procedural violations. St. Peter's letter recalled the benefits the Club previously provided to the military, such as reduced rates, and explained that
 
 
 24
 [i]n return the Government has accorded Presidio Golf Club members certain reciprocal benefits with respect to the use of the golf course. It is those benefits which provide the reason for golfers to join the Club. The Park Service has now severed the linkage. If there are no benefits with respect to a golfer using the golf course by virtue of Club membership, that membership loses its attraction. If members do not join the Club, it will go under. If it goes under, the historic Clubhouse will no longer be maintained and may well be demolished.
 
 
 25
 The Park Service contends that it is highly "speculative and conjectural" that the Club will suffer any such injury as a result of the defendants' alleged procedural violations.
 
 
 26
 The Club's description of the feared chain of events blames the loss of members on the new public clubhouse, and cites the loss of members as an essential step leading to the Club's demise and the destruction or decay of the historic Clubhouse. As the district court noted, however, the Club had "already lost one-third of its members even before construction of the new clubhouse has begun," and "[b]y the time of oral argument [in the district court], plaintiff's counsel attested that the Club had lost half of its members." The district court determined that "the most reasonable inference is that the cause of plaintiff's economic problems is not the existence of a new public clubhouse, but the loss of the Club's exclusive access to the golfcourse that occurred when the Presidio was transferred from the army to the [Park Service]."
 
 
 27
 The district court was correct to infer that the Club's membership losses to date are attributable to the loss of semi-exclusive course privileges rather than the plan to build a new public clubhouse. The Park Service contends that because such injuries are not traceable to its plan to build the new clubhouse, the Club lacks standing to challenge the adequacy of the environmental assessment. It is likely, however, that once the new public clubhouse is completed, the Club will lose more members, in particular those who joined the private club for its facilities, rather than its special rights to use of the golf course. Once most of the facilities are available at the new clubhouse, many more members may wish to stop paying private club membership dues. Such additional membership losses could well prove fatal to the Club, and constitute a future injury-in-fact that is fairly traceable to the Park Service's alleged procedural violations. That injury would also be redressable by favorable court action here, because the cure for alleged deficiencies in the EA and the failure to prepare an EIS is further and adequate studies, which could lead to the modification or elimination of the plan to build the public clubhouse.
 
 D. Conclusion
 
 28
 We conclude that the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected" by NEPA or NHPA; that the Club can sue in its representative capacity; and that while it is a close question, the injury asserted by the Club is fairly traceable to the building of the public clubhouse. Accordingly, we hold that the Club has standing.
 
 III. Adequacy of the Environmental Assessment
 
 29
 "When reviewing an administrative agency's decision, we view the case from the same position as the district court." Western Radio, 79 F.3d at 900. "An agency's decision should be overturned if it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " Id. (quoting 5 U.S.C. § 706(2)(A)). "Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency." Id.
 
 
 30
 An EA must "[b]riefly provide sufficient evidence and analysis" to determine whether the agency must prepare an EIS or, in the alternative, issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). A FONSI is a document issued in conjunction with an EA that "briefly present[s] the reasons why an action ... will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." Id. at § 1508.13.
 
 
 31
 A. Alleged failure to consider alternatives adequately
 
 
 32
 NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Northwest Environmental Defense Center v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir.1997) (quotations omitted). This court "review[s] an agency's range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." Id. (quotations omitted).
 
 
 33
 The Club asserts that the EA is inadequate because "it fails to consider any alternatives to a new clubhouse involving cooperative use of the historic Clubhouse." While it may be true that the Park Service did not consider "cooperative use" arrangements as alternatives, it fulfilled its duties under NEPA by considering other reasonable alternatives.
 
 
 34
 The EA circulated by the Park Service in May 1996 considers in detail three alternatives, including a "no action" alternative. The EA also considered the alternative of re-using the "Existing Private Clubhouse" in a short section entitled "Alternatives Considered but Rejected." Several reasons were given for rejecting that alternative:
 
 
 35
 Previous analysis has been conducted to review the advantages and disadvantages of purchasing the private clubhouse versus constructing a new facility. In general, the existing private clubhouse does not meet essential management needs and any required alterations and additions that would be needed to accommodate new uses would be prohibitively expensive. The clubhouse is too small for anticipated additional demand for the public course and would require land acquisition funds and a boundary adjustment.
 
 
 36
 The Park Service also points out that the Club had long expressed its wish to remain a private club, which could have led the Park Service reasonably to believe that the Club would not have been receptive to "cooperative use" options. Responding to the suggestion "that [the] National Park Service should buy the private clubhouse," the Park Service responded that the "Club has maintained throughout the four-year public review process for the Presidio GMPA/FEIS, and the subsequent public process undertaken by the [Park Service] for this Environmental Assessment, that they were not interested in becoming a public facility." This is supported by the affidavit of Stephen Crabtree, Regional Chief of Concession Program Management for the National Park Service's Pacific West Region, which describes meetings with Club members at which they "expressed a steadfast desire to remain a private club," and explains how previous analysis identified obstacles to purchasing the Clubhouse, such as the need to change the Presidio boundary, and the need for an act of Congress to acquire the land or pursue condemnation proceedings.
 
 
 37
 The Park Service also considered the option of leasing the Club but rejected that option because the cost of retrofitting would be prohibitive, and because the covenants, conditions, and restrictions in the Club's deed require the Club to remain private. Under the circumstances, the Park Service considered sufficient alternatives to permit a reasoned choice.
 
 B. Timing of the decision to build
 
 38
 The Club contends that the Park Service decided to build the new clubhouse before preparing the EA to assess that decision. "NEPA requires consideration of the potential impact of an action before the action takes place." City of Tenakee Springs v. Clough, 915 F.2d 1308, 1313 (9th Cir.1990). The Club enumerates seven instances in the voluminous record that it claims reveal that the Park Service "(consciously or unconsciously) tailored the NEPA process in such a manner that a FONSI was all but assured."
 
 
 39
 The Club cites as an example a letter stating that "NEPA compliance will end with the [Park Service] preparation and approval of a Finding of No Significant Impact (FONSI)." The Club points to the EA schedule which lists the last step as "Approval by NPS" followed by an arrow pointing to a handprinted notation, "FONSI."
 
 
 40
 These examples and others cited by the Club simply reflect a confidence on the part of the Park Service that the proposed plan would be adopted, which is permissible. See Coalition Against a Raised Expressway, Inc. v. Dole, 835 F.2d 803, 808 (11th Cir.1988) (despite evidence that officials instructed researchers that "alternatives [to a project] should only be studied until they can be proven unfeasible," court held it was allowable for the agency to express "confidence that the alternatives ultimately would turn out to be unfeasible"); Environmental Defense Fund, Inc. v. Corps of Eng'rs of United States Army, 492 F.2d 1123, 1129 (5th Cir.1974) ("letters [that] convey a spirit of confidence on the part of the writer that the project would be found to be acceptable environmentally" found compatible with intent "to give the fullest possible consideration to the environmental consequences of the project under NEPA").
 
 
 41
 IV. Requirement of an Environmental Impact Statement
 
 A. Significance of impact
 
 42
 NEPA provides that an EIS must be prepared on proposals for major federal actions significantly affecting the quality of the human environment. 40 C.F.R. § 1502.3. The term "significantly" is defined to require "considerations of both context and intensity." Id. at § 1508.27. The term "intensity" "refers to the severity of impact," which should be evaluated according to ten enumerated factors. Id. at § 1508.27(b)(1)-(10). The Club claims that the Park Service ignored five of the enumerated factors when assessing the significance of any impact on the Clubhouse and considering whether to prepare an EIS. For the reasons stated below, we hold that the Park Service did not act arbitrarily or capriciously with reference to these five factors.
 
 1. Impact on historical resources
 
 43
 The Club contends that the Park Service failed to consider the "degree to which the action may adversely affect districts [or] sites ... eligible for listing in the National Register of Historic Places." 40 C.F.R. § 1508.27(b)(8). It did not. The May 1996 EA summarized studies of cultural environmental consequences at Table 2, which included comparisons between each alternative's "[m]odifications to National Historic Landmark District" and "[d]isturbance of historic structures." Further, the Park Service's responses to public commentary on the EA indicate that new buildings "will be designed in a manner compatible with the Presidio military architecture and therefore would not adversely impact the Presidio National Historic Landmark District."
 
 
 44
 2. Unique characteristics of the geographic area
 
 
 45
 The Club contends the Park Service failed to consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, ... or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). As described just above, the Park Service did take into account the proximity to historic resources, including the Clubhouse, and the EA is replete with considerations of the unique characteristics of the Presidio and its ecological resources.
 
 3. Highly controversial
 
 46
 The Club claims that the Park Service failed to consider the "degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). A review of the public comments and responses discloses mostly specific, localized concerns, such as the number of parking spaces and the use of non-native plants. In the regulations, the term "controversial" is modified by the term "highly," apparently in recognition that not every controversy is worth consideration. Nevertheless, the Park Service's responses to public comments reflect the agency's commitment to considering suggestions of all types.
 
 4. Uncertainty of impacts
 
 47
 The Club contends that the Park Service failed to consider the "degree to which the possible effects on the human environment are highly uncertain or involve unique and unknown risks." Id. at § 1508.27(b)(5). The Club points to the plummeting numbers on its membership rolls as proof that the effects of the proposed clubhouse are uncertain. The loss of members is not an uncertain effect of the public clubhouse, which is yet to be built, but is largely attributable to the loss of course privileges, as discussed above. Nevertheless, the Park Service did consider the impact of the project on the Clubhouse: "The [Park Service] has further determined that the new public facilities will not compete with the private club because it will not offer an expansive environment for exclusive recreation, socializing or evening banquets which the private club facilitates." There is no indication that the effects on the human environment wrought by replacing the Army golf course buildings with a new public clubhouse are unique, unknown, or highly uncertain.
 
 5. Precedent for future action
 
 48
 The Club claims the Park Service failed to consider the "degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." Id. at § 1508.27(b)(6). The purpose of that section is to avoid the thoughtless setting in motion of a "chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." Sierra Club v. Marsh, 769 F.2d 868, 879 (1st Cir.1985). The Club theorizes that because the public clubhouse is the first new construction in the Presidio, it will establish a precedent for what constitutes a sufficient EA. The public golf clubhouse is a unique, independent project, however, and does not serve to establish any precedent. The Club has not shown that any similar or related projects are being contemplated.
 
 B. Reasonably foreseeable effects
 
 49
 The Club alleges that the Park Service failed to take adequate account of the reasonably foreseeable effects of the new clubhouse on the historic private Clubhouse. After the Club voiced its concerns during the public comment phase of the EA, the Park Service specifically reviewed and considered the risk of competitive harms caused by the new public clubhouse to the old Clubhouse, as reported by the Park Service to state and local historic preservation officers:
 
 
 50
 The proposed new clubhouse would not compete with the PGC clubhouse, as is suggested by the private PGC.... It would not duplicate the private PGC clubhouse in function. Indeed, its function would be the polar opposite. Whereas the PGC clubhouse serves private club members in an expansive environment (roughly 15,000 square feet according to an NPS estimate), offering an exclusive setting for recreation, socializing, and evening banqueting, the proposed clubhouse would be much smaller in scale, and open to any member of the public rather than exclusive and of limited membership.... Dining facilities at the proposed public clubhouse would be informal, and open only during daylight hours.
 
 
 51
 Nevertheless, the Club faults the Park Service's consideration of the issue as inadequate.
 
 
 52
 "Agencies must consider only those indirect effects that are 'reasonably foreseeable.' They need not consider potential effects that are highly speculative or indefinite." Sierra Club v. Marsh, 976 F.2d 763, 768 (1st Cir.1992). While we have found an adequate string of causation necessary to confer standing, it does not necessarily follow that such a highly attenuated chain of causation as the Club alleges would lead to injuries cognizable under NEPA. NEPA requires "a reasonably close causal relationship between a change in the physical environment and the effect at issue." Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 774, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983). We hold that it was neither arbitrary nor capricious for the Park Service not to take fuller account of the remote environmental effects on the historic private Clubhouse that might result from the economic impact of competition from the new public clubhouse.
 
 
 53
 V. Due Consideration of the Club as an "Interested Person"
 
 
 54
 The Club contends that the Park Service erred during the NHPA historic review process by failing to consider the Club an "interested person" and duly consulting with it. By letter of August 19, 1996, the Club requested that the Park Service accord it "interested party" status. The Park Service did not contact the Club until three weeks later, when it wrote to inform the Club that "[a]t this point in time, we do not believe that additional consultation with the [Club] is necessary."
 
 
 55
 The Park Service argues that it had no duty to include the Club as a consulting party because it issued a "Determination of No Adverse Impact" under NHPA. Instead, the Park Service maintains that its only duty was to consider the Club's views, which it believed were amply expressed in a series of detailed letters and comments at public hearings. Those comments included
 
 
 56
 a ten-page letter from the Club's counsel, Nicholas Yost, dated June 19, 1996; a seven-page letter from the Club's consultant, Paul Sedway, dated June 17, 1996; an additional two-page letter from Yost, dated June 21, 1996; and live testimony from Yost, Sedway, and the Club's president, Michael St. Peter, at the formal public hearing on the EA, which was held on June 19, 1996.
 
 
 57
 Order at 29 (citations omitted). We agree with the district court's analysis of this issue:
 
 
 58
 The [Park Service] argues that unless it found an adverse impact on the old Clubhouse, it only needed to consider the views of interested parties, and it did so. Compare 36 C.F.R. § 800.5(a) (in assessing whether a proposal has an effect on a historic property, agency must give "consideration to the views, if any, of interested persons") with 36 C.F.R. § 800.5(e) (when an adverse effect on a historic property is found, the agency must consult with the [State Historic Preservation Officer], the [Advisory Council on Historic Preservation], and interested parties to seek ways to reduce the effect on the historic property).
 
 
 59
 The Park Service's responses to public comments, included in the Staff Report's revised EA, reflects that the Park Service did in fact take into account, but disagreed with, the Club's concerns:
 
 
 60
 * * * Contrary to the private club's suggestion, the [Park Service] finds that the proposed undertaking would not isolate the private Presidio Golf Club from the golf course and would not alter the character of the setting of the golf course which makes it eligible for the National Register. The proposed undertaking would simply replace the existing Army facility with a new federal facility that would support public play, and therefore maintain the duel [sic] private club and federal golf course facilities and relationship. New buildings will be designed in a manner compatible with the Presidio military architecture and therefore would not adversely impact the Presidio National Historic Landmark District. * * * * The [Park Service] has further determined that the new public facilities will not compete with the private club because it will not offer an expansive environment for exclusive recreation, socializing or evening banquets which the private club facilitates. * * * *
 
 
 61
 It appears that the Park Service complied with NHPA by giving consideration to the views of interested parties, and was not required to "consult with ... interested persons" because no adverse effect on a historic property was found. 36 C.F.R. § 800.5(e).
 
 
 62
 VI. The District Court's Reliance upon a "Litigation Affidavit"
 
 
 63
 The Club contends that the district court erred by relying upon the declaration of Stephen G. Crabtree, prepared for litigation purposes. Crabtree is the Regional Chief of Concession Program Management for the Park Service's Pacific West Region. In 1992, he met with representatives of the Club to discuss the future of the Presidio golf course. The Club representatives expressed a "steadfast desire to remain a private club." Crabtree's declaration also describes discussions he had during the planning process with Don Neubacher, head of the planning team, "regarding the potential for use of the private clubhouse" in conjunction with the golf course. Crabtree's description of the substance of those discussions, set forth in the margin here and quoted in full by the district court, explains what the EA refers to when it uses the term "previous analysis."[1]
 
 
 64
 The Supreme Court has forbidden district courts from relying upon litigation affidavits and "post hoc " rationalizations for agency action. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, "[t]he general rule prohibiting post hoc rationalizations is not without exceptions. In Overton Park, the Supreme Court expressly authorized the trial court to allow the Secretary of Transportation to 'prepare formal findings' in order to 'provide an adequate explanation for his action.' " Kunaknana v. Clark, 742 F.2d 1145, 1149 (9th Cir.1984) (quoting Overton Park, 401 U.S. at 420, 91 S.Ct. 814). This court in Kunaknana noted that the Ninth Circuit has adopted "the more 'enlightened' approach which permits 'explanation' of agency decision-making" so as to provide a "satisfactory explanation of agency action [which] is essential for adequate judicial review." 742 F.2d at 1149. Crabtree's affidavit explained the Park Service's prior analyses of the possibility of using the private clubhouse, and the district court found it helpful. The district court did not err in considering it.
 
 CONCLUSION
 
 65
 While the issue of standing is a close one, we conclude that the Club had standing to contest the decision to construct a new clubhouse. We find that the Park Service's EA was adequate and that its decision to proceed with the construction of the new clubhouse was neither arbitrary nor capricious.
 
 
 
 [1]
 Crabtree's explanation was as follows:
 We expected to need a facility able to serve all golfers and expected an increase in facility use. The private clubhouse building would have to be modified in order to provide appropriate public access and sufficient men's and women's locker rooms and showers, day use food and beverage facilities, a pro shop, and so forth. Reception and lounge spaces were not desirable for our purposes. We discussed whether the building was large enough, whether the layout was adequate, what renovation would have to be done, and other constraints that posed difficulties in the context of use by the increased number of public golfers to be served. Based upon our discussion and consideration of these various factors, we determined that the existing building would require renovation. And, we expected such renovation to be costly. We expected some concern by the residential neighbors of the building to our expanded use and activity in the building. Additionally, we did not control the building and it was not being offered for our use. We expected that acquisition would require congressional authorization, and, or course, that we would have to pay fair market value for the property. Given these reasons and the club's clearly expressed desire to remain a private club, we determined that use of the private clubhouse was not a viable option worthy of a detailed analysis or worth pursuing as a practical matter.